*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AMBER MCCOMBS,

　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

MEIJER, INC., d/b/a MEIJER'S SUPERMARKETS,

　　　　　　　　*Defendant-Appellant.*

Nos. 03-3612/3758/4357

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00358—Susan J. Dlott, District Judge.

Argued: September 21, 2004

Decided and Filed: January 19, 2005

Before: KEITH, MOORE, and GILMAN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Michael H. Carpenter, CARPENTER & LIPPS, Columbus, Ohio, for Appellant. Richard N. Selby, DWORKEN & BERNSTEIN, Painesville, Ohio, for Appellee. **ON BRIEF:** Michael H. Carpenter, Timothy R. Bricker, CARPENTER & LIPPS, Columbus, Ohio, for Appellant. Richard N. Selby, DWORKEN & BERNSTEIN, Painesville, Ohio, John H. Metz, Cincinnati, Ohio, for Appellee.

KEITH, J., delivered the opinion of the court, in which MOORE, J., joined. GILMAN, J. (pp. 13-15), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

DAMON J. KEITH, Circuit Judge. Defendant-Appellant, Meijer, Inc., appeals the jury verdict for Plaintiff-Appellee, Amber McCombs, in a sexual harassment lawsuit based on Ohio state law and Title VII of the Civil Rights Act of 1964. Defendant-Appellant also appeals the award of attorneys' fees and costs by the district court. Based on the following reasons, we **AFFIRM** the district court's decision as to all issues on appeal.

1

# I. BACKGROUND

## A. Factual

Defendant-Appellant, Meijer, Inc. ("Meijer"), owns and operates grocery and general merchandise retail stores. Plaintiff-Appellee, Amber McCombs ("McCombs"), was an employee in the meat department in one of Meijer's stores in West Chester, Ohio, from October 1996 until January 1998. William Pound ("Pound") was also employed by Meijer at the same location from at least May 1997 until his termination on December 10, 1997. McCombs alleges that Pound sexually harassed her and that Meijer failed to address this problem.

McCombs first encountered Pound in May 1997, when he informed her that he had told his wife (who was also an employee of Meijer) that the two of them were having an extramarital affair. He warned McCombs that she was in danger of being "beat up" by his wife. McCombs informed her supervisor, Steve Dolan ("Dolan"), of this threat.[1] McCombs was unaware of any action taken by Dolan to resolve this problem. Approximately two months later, in July 1997, Pound was transferred from the grocery to the meat department. McCombs and Pound became friendly toward each other, and McCombs joined several of her co-workers to help clean Pound's home because his wife had recently given birth. McCombs also admits that Pound and his children "came over"[2] for Halloween.

Notwithstanding McCombs's cordial attitude towards him, Pound consistently made inappropriate remarks to her again during the fall of 1997. For example, Pound told McCombs explicit sexual fantasies that involved the two of them, that he liked her "ass," that he wanted to kiss her breasts, that she aroused him, and that he wanted her to have a "threesome" with him and his wife. McCombs testified that she informed various employees about Pound's behavior, including her direct supervisor, Dolan, and "Department 10," which handles sexual harassment complaints. None of these employees responded and, instead, they dissuaded her from making a written complaint because it might lead to Pound's termination.

At trial, McCombs testified that Pound touched her buttocks on November 23, 1997. It was her belief that this unprovoked and improper touching "crossed the line." As a result, McCombs reported this incident to Department 10 and a written complaint was logged on November 25, 1997, at 10:00 p.m. In addition to the improper touching of her buttocks, McCombs claimed that the harassment had been occurring for "a long time and [she] want[ed] it stopped." Def.'s Ex. 7.

On November 26, McCombs and Pound were scheduled to work together. One of Meijer's investigative detectives questioned Pound about the incidents alleged in McCombs's complaint. Pound admitted that he touched McCombs but viewed it "as a pat on the back," and also admitted that he told McCombs that he liked "the way that her legs went up to her butt," that he wanted to kiss her on her breast, and that she aroused him. After Pound had been interviewed regarding the sexual harassment allegations and admitted much of his behavior, Meijer allowed him to return to work in the meat department with McCombs. While McCombs was working, Pound entered into the area behind the meat counter. As he entered, Pound stared at McCombs and kicked open the doors by way of a "karate kick." McCombs testified that this made her frightened, so she verbally informed Dolan of this threatening incident. On December 1, 1997, Meijer warned Pound that any further actions would result in his termination.

---

[1] Meijer's sexual harassment policy states that "telling lies or spreading rumors about a person's sex life" is an example of sexual harassment. Pl.'s Ex. 4.

[2] McCombs does not specify where they "came over." Presumably, McCombs is referring to her house.

On December 3, 1997, McCombs and Pound worked together again for the first time since November 26. Pound continued to look at McCombs and would purposely come into her work area. She was disturbed by his actions, so McCombs filed a second written complaint. The complaint filed on December 3 again referenced previous actions of Pound that McCombs found to be inappropriate, including that Pound told her that he wanted to kiss her all over and that he could hardly control himself. McCombs again stated that she wanted this harassment to stop.

On December 4, 1997, McCombs and Pound were scheduled to work together again. Prior to Pound's arrival, McCombs filed her third written complaint. In the December 4 complaint, McCombs described an incident from the prior evening where Pound walked over to the counter near McCombs, holding a bloody knife in his hand. He held the knife at face level, and stared at her while he wiped the knife (the "knife incident"). McCombs stated that this made her feel very upset and that she did not want him working near her. Her complaint stressed that Pound should not even be allowed to shop at the store "after what [Pound] said to [her] and how he touched [her]." Def.'s Ex. 9. Consequently, that same day, Pound was removed from the meat department and transferred to another department. The same day that she filed her third complaint, McCombs also filed a complaint with the local police department regarding the knife incident.[3]

On December 6, 1997, two days after McCombs filed her third complaint, Meijer suspended Pound from work. Pound never returned to work and was terminated on December 10, 1997.

On December 30, 1997, McCombs was suspended from work at Meijer based on an allegation that she had stolen spices and compact discs from Meijer. McCombs was then terminated on January 6, 1998, for violating Meijer's theft policy.

## B. Procedural

In May 1999, McCombs filed a complaint in the United States District Court for the Southern District of Ohio against Meijer alleging claims of sexual harassment and retaliation in violation of Ohio Revised Code § 4112, Title VII of the Civil Rights Act of 1964 ("Title VII"), and Ohio public policy,[4] as well as sexual harassment under Ohio common law. After the district court denied Meijer's motion for summary judgment, the case went to trial. After an eight-day trial, on September 28, 2001, the jury returned a verdict in favor of McCombs for sexual harassment in violation of Title VII and Ohio Revised Code § 4112, but found in favor of Meijer for the retaliation claims and the sexual harassment claim filed under Ohio common law. The jury awarded McCombs $25,000 in compensatory damages and $100,000 in punitive damages. The jury also found that Meijer would be liable for McCombs's attorneys' fees.

After the verdict was entered, Meijer filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), and McCombs filed a motion for attorneys' fees and costs. On March 31, 2003, the district court denied Meijer's motion for judgment as a matter of law. On April 28, 2003, the district court adopted the Magistrate Judge's recommendation and awarded McCombs $460,450 in attorneys' fees, $4,532.50 in expert witness fees, and $10,103.34 in costs. Meijer timely appealed both the denial of its motion for judgment as a matter of law and the district court's award of fees and costs. In conjunction with this appeal, McCombs filed a motion for supplemental fees related to post-trial work. On September 19, 2003, the district court adopted the Magistrate Judge's report and awarded supplemental attorneys' fees of $14,192.50. Meijer also

---

[3]As a result, one month later, Pound pleaded no contest to the charge of disorderly conduct.

[4]The claim based on Ohio public policy was never presented to the jury and is not the subject of this appeal.

timely appealed that decision. All three appeals have been consolidated and are now before this court.

On appeal, Meijer asserts that the district court committed four reversible errors. First, Meijer argues that the district court erred by denying it judgment as a matter of law on McCombs's sexual harassment claims and on the award of punitive damages. Second, Meijer argues that the district court erred by submitting improper instructions to the jury. Third, Meijer argues that the district court erred by making improper evidentiary rulings. Last, Meijer argues that the district court erred in its award of fees and costs. We will address each of these arguments in turn.

## II. ANALYSIS

### A. Judgment As A Matter of Law

When a district court denies a motion for judgment as a matter of law, we review its decision de novo. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 794 (6th Cir. 2004). In determining whether a motion should have been granted, we must review the entire record, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Judgment as a matter of law is appropriate only where "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed. R. Civ. P. 50(a)(1).

### 1. Sexual Harassment

In this case, the jury found that Meijer was liable to McCombs for sexual harassment under both Title VII and Ohio Revised Code § 4112. Meijer subsequently filed a motion for judgment as a matter of law, which the district court denied. Meijer asserts on appeal that the district court erred in its finding because there was no legally sufficient evidentiary basis for the jury to find that Meijer knew that Pound was sexually harassing McCombs and that Meijer failed to take prompt action to correct the problem. We disagree.

Even after a hostile work environment has been established, "[f]or an employer to be liable for the sexual harassment of an employee by a coworker, the harassed employee must show that the employer both (1) knew or should have known of the harassment and (2) failed to take prompt and appropriate corrective action." *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001) (citing *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999)); *see also Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir. 1997). This court has found that when the allegations of sexual harassment involve a coworker and the employer has fashioned a response, the employer will only be liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship*, 123 F.3d at 873. "The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment." *Id.* Thus, an employer who implements a remedy "can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Id.*[5]

Meijer urges us to find that there was no legally sufficient evidentiary basis for the jury to have found for McCombs in her claims of sexual harassment for two reasons. First, Meijer claims

---

[5]*See also Greenwood v. Delphi Auto. Sys., Inc.*, 103 Fed. Appx. 609, 2004 WL 1532266 (6th Cir. June 28, 2004) (applying language and reasoning from *Blankenship*); *Gwen v. Reg'l Transit Auth.*, 7 Fed. Appx. 496, 2001 WL 345793 (6th Cir. Mar. 27, 2001) (same); *Summerville v. Ross/Abbott Labs.*, 187 F.3d 638, 1999 WL 623786 (6th Cir. Aug. 10, 1999) (same).

that McCombs did not report the harassment until November 25, 1997, and therefore Meijer did not know or should not have known of these allegations prior to that date. In support of its theory, Meijer asserts that the jury could not have found Meijer liable for Title VII and Ohio statutory sexual harassment,[6] but not liable for Ohio common law sexual harassment. Ohio common law sexual harassment requires a finding of a "past history of sexual harassment about which the employer knew or should have known." *Bell v. Cuyahoga Cmty. College*, 717 N.E.2d 1189, 1193 (Ohio Ct. App. 1998). Meijer contends that because the jury decided in favor of Meijer in the Ohio common law claim it is impossible for the jury to have found that Meijer knew of Pound's behavior prior to McCombs's first written complaint.

We must assume, however, that Meijer had knowledge of Pound's harassing behavior *before* November 25.[7] Contrary to Meijer's argument, this conclusion can be consistent with the jury finding for Meijer on the claim of common law sexual harassment. As to the common law claim, the jury was instructed that "McCombs must show that the employee had a past history of gender harassment about which Meijer knew or should have known." Trial Tr. at 1389. No further instruction was given by the district court in defining "past history." Ohio Courts, moreover, have not definitively established what constitutes "past history."[8] At best, the Ohio Supreme Court that first discussed "past history" merely indicated that a defendant-employer is not entitled to summary judgment under a common law sexual harassment claim where there exists a genuine issue of material fact as to whether the employer knew that its employee had previously victimized five different employees on separate occasions. *Kerans v. Porter Paint Co.*, 575 N.E.2d 428, 435 (Ohio 1991). Furthermore, courts interpreting *Kerans* have not determined a precise definition of "past history." *See, e.g., Hodoh-Drummond v. Summit County*, 84 F. Supp. 2d 874, 881 n.8 (N.D. Ohio 2000) (noting that "[u]nlike in *Kerans*, in this case there is no evidence that any employees lodged similar complaints against [the alleged harassing employee]"); *Thompson v. W. Auto Supply Co.*, 1996 WL 488029, at *5 (Ohio Ct. App. May 8, 1996) (finding that, where plaintiff never informed her employer of co-workers harassing behavior, claim for common law sexual harassment failed because no "past history of sexual harassment"); *Seiber v. Wilder*, 1994 WL 558969, at *3 (Ohio App. Ct. Oct. 12, 1994) (finding that *Kerans* does not require summary judgment in favor of employer where the alleged harasser had not previously been accused of sexual harassment and therefore "does not have a history of sexually harassing behavior").

In light of the varying interpretations of what constitutes "past history," we are unable to subscribe to Meijer's argument that the jury could not have reached the conclusion that Pound had no past history of harassment, yet still find Meijer liable under Title VII and Ohio statutory law. McCombs's lawsuit focuses on a specific time period, ranging from late May 1997 to early December 1997. We believe that the connotation of the term "past history" could reasonably refer to events outside of the ones outlined in McCombs's complaint; in other words, a "past history" can relate to harassment violations that occurred *prior to* the allegations set forth in this case. We, therefore, find that it was reasonable for the jury to find that a "past history" had not been established, while simultaneously finding that Meijer had knowledge of Pound's behavior in this case prior to November 25, 1997.

---

[6] Ohio's statutory provision is almost identical to Title VII and has been analyzed using federal interpretation of Title VII. *See Delaney v. Skyline Lodge, Inc.*, 642 N.E.2d 395, 399 (Ohio Ct. App. 1994).

[7] When deciding whether the court erred in denying Meijer's motion for judgment as a matter of law, we consider all evidence in the light most favorable to the plaintiff and must not make credibility determinations. *Reeves*, 530 U.S. at 150. As such, we must accept as true McCombs's testimony that she orally informed her supervisor and Department 10 about Pound's harassment prior to her first written complaint.

[8] Although the dissent arbitrarily limits the jury's consideration of "past history" as being only from "May through December," dissent at 13, neither the jury instructions nor the case law support this conclusion.

Second, Meijer asserts that its actions — i.e., investigating Pound, transferring him out of the meat department, suspending him, and eventually terminating him — were not indifferent, reckless, or unreasonable, but rather were "prompt and appropriate." Meijer's assertion is based on the notion that it was unaware of Pound's behavior until November 25. Because we have indicated that a jury could reasonably find that Meijer knew of the behavior prior to the first written incident,[9] we must decide whether Meijer's actions were prompt and appropriate as required by law. An employer will only be liable if its response "manifests indifference or unreasonableness." *Blankenship*, 123 F.3d at 873. In this case, viewing the evidence in the light most favorable to McCombs, a jury could have found that Meijer's inaction amounted to indifference or unreasonableness. Pound was transferred to McCombs's department *after* she informed her supervisor that Pound was spreading rumors of having an extramarital affair with her. Prior to filing her first written complaint, McCombs orally informed her supervisor and Department 10 on several occasions of Pound's inappropriate conduct. Neither addressed her concerns. This evidence is legally sufficient to establish that Meijer acted both indifferently and unreasonably. We therefore conclude that the district court did not err in denying Meijer's motion for judgment as a matter of law with regard to the sexual harassment claim.

## 2. Punitive Damages

After it found Meijer liable to McCombs under the sexual harassment claims, the jury awarded McCombs both compensatory and punitive damages. Meijer contested the award of punitive damages in its motion for judgment as a matter of law, arguing that the jury lacked any legally sufficient evidence to find that Meijer acted with actual malice. The district court denied Meijer's motion, which Meijer challenges on appeal.

Under Ohio law, punitive damages can be awarded through a showing of clear and convincing evidence.[10] Ohio Rev. Code § 2315.21(C). Punitive damages are available in employment discrimination cases if there is a "finding of actual malice." *Rice v. CertainTeed Corp.*, 704 N.E.2d 1217, 1220 (Ohio 1999). Actual malice can be found under two circumstances: (1) if a person acts with hatred, ill will, or revenge; or (2) if a person acts with "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E. 2d 1174, 1176 (Ohio 1987). To meet the second definition, the person must "possess knowledge of the harm that might be caused by his behavior," *id.* at 335, and, nevertheless, "consciously disregard[] the injured party's rights or safety," *id.* at 336.

At issue in this case is the second circumstance. Because Meijer filed a motion for judgment as a matter of law on this issue as well, we must examine the facts in the same manner, viewing all evidence in the light most favorable to McCombs. Meijer suggests that a reasonable jury could not

---

[9]The dissent glosses over our standard of review. The dissent notes that McCombs never filed a written complaint before November 25, 1997, but seemingly discredits McCombs's testimony that she was dissuaded by Meijer employees from filing a written complaint. *See* Dissent at 13-14. Rather than accepting McCombs's statements that she orally informed appropriate personnel of Pound's harassing behavior prior to November 25, the dissent highlights McCombs's testimony regarding her cordial attitude toward Pound. *Id.* In light of the standard of review, we cannot agree with the dissent's conclusion that the jury could not have found that Meijer knew of Pound's inappropriate behavior prior to November 25. Moreover, we find the dissent's conclusion—"that McCombs had not expected Meijer to take any action against Pound prior to [November 25]"—of little relevance to our decision. *Id.* at 14. Whether McCombs "expected" Meijer to act is not the proper inquiry; instead we must ask whether a reasonable jury could conclude that Meijer knew of Pound's behavior prior to November 25, and thus acted unreasonably and indifferently.

[10]For punitive damages involving Title VII, this court has held that only a preponderance of the evidence is required. *See White*, 364 F.3d at 808-09. Because Ohio law applies a stricter standard than Title VII, we only discuss Ohio law.

find that it acted with conscious disregard for McCombs's safety such that the disregard had a great probability of causing substantial harm. We disagree.

Here, in McCombs's first written complaint, she indicated that this harassment had been occurring for a long period of time and that she wanted it stopped. McCombs also testified that, on the day that Pound was informed of her first written complaint, Pound threatened her by staring at her and opening the doors with a "karate kick." McCombs verbally reported this incident to her supervisor. Meijer knew of Pound's hostile behavior, yet it did not separate Pound from McCombs. Instead, Meijer allowed Pound to return to the same department as McCombs. Several days later, McCombs filed a second written complaint, explaining that Pound continued to stare at her and come into the area where she was working. In her second complaint, McCombs also informed Meijer that Pound had told her that he could hardly control himself around her. Again, McCombs stated that she wanted this harassment to stop. The following day, Meijer again did not act. McCombs then filed her *third* written complaint, which described how Pound stared at her while holding a bloody knife in his hands. This made her feel very ill and she informed Meijer that she wanted him transferred from her department or even fired. Finally, after the third complaint, Meijer transferred Pound into a different department from McCombs.

In reviewing the entire record, making reasonable inferences in favor of McCombs, we find that there is clear and convincing evidence such that a reasonable jury could have found that Meijer acted with conscious disregard for McCombs's safety and would be liable for actual malice. McCombs informed her supervisor and Department 10 that Pound was verbally harassing her prior to the first written complaint. Moreover, the karate kick incident that occurred on the same day that Pound was notified that McCombs had filed her first written complaint against him put Meijer on notice that substantial harm could occur and that McCombs's safety was at risk. Even though Meijer knew that Pound had threatened McCombs, Meijer allowed Pound to remain not only at work, but also in the same department as McCombs. It was not until McCombs filed her third written complaint and specifically requested that Pound be removed from her area that Meijer finally took active steps to prevent further harassment and harm. A reasonable jury could have certainly concluded that Meijer acted with substantial disregard for McCombs safety by not immediately addressing her complaints regarding the harassment and then by permitting Pound to remain in the work area after it knew that Pound had intimidated McCombs. For these reasons, we find that the district court did not err in denying Meijer judgment as a matter of law with regard to punitive damages.

## B. Jury Instructions

In reviewing jury instructions, we ask "whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *Roberts v. Galen of Va. Inc.*, 325 F.3d 776, 787 (6th Cir. 2003) (internal quotation marks and citations omitted). Moreover, we may only reverse a judgment when the instructions are "confusing, misleading, *and* prejudicial." *Id.* at 787 n.3 (emphasis added).

In this case, Meijer purports that the jury instructions were erroneous in two ways. First, Meijer asserts that the jury was incorrectly provided with instructions regarding the doctrine of *respondeat superior*. Meijer objects to the language instructing that an "employer may be held liable for the acts of its employee when they are done within the scope of the authority given to the employees by the employer or within the scope of the employees' duties." Trial Tr. at 1386. In focusing solely on this one sentence, Meijer fails to show that the instructions taken *as a whole* were misleading, confusing, and prejudicial. In fact, the jury instructions explained that, to find liability, the jury must determine that "Meijer knew or should have known of the conduct but failed to implement prompt and appropriate corrective action." *Id.* at 1388. The district court also instructed the jury that if it found that Meijer implemented a remedy, then Meijer could only be liable for

harassment "if that remedy exhibits such recklessness and indifference as to indicate an attitude of permissiveness." *Id.* at 1389. The jury instructions in their entirety made clear that Meijer would not be liable simply because it was the employer. Thus, Meijer's *respondeat superior* argument fails.

Second, Meijer argues that it was prejudiced because the jury was not instructed to consider all of the circumstances, without using hindsight, when evaluating Meijer's response to the allegations of sexual harassment. This argument is also without merit. In its instructions, the court explained to the jury that McCombs alleged that "Meijer's remedy and response to her complaint of gender harassment was reckless and indifferent *in light of the facts known to it at the time.*" Trial Tr. at 1386-87 (emphasis added). After providing the jury with this explanation, the court then instructed the jury as follows:

> When determining whether a reasonable person would find the alleged harassment sufficiently severe or pervasive to constitute a hostile work environment, you must consider the *totality of the circumstances instead of looking at each single event.* That is, you must determine whether, taken together, the accumulated effect of all the reported incidents of harassment amounted to a hostile work environment.

> You must determine whether Meijer took prompt and appropriate corrective action in responding to the harassment or whether its remedy exhibits such an indifference as to indicate an attitude of permissiveness that amounts to discrimination. You must determine whether Meijer acted in good faith; that is, whether Meijer took remedial action that was *reasonably calculated to end the harassment once it became aware of the harassment.*

*Id.* at 1390-91 (emphasis added).

As we have stated, "[o]ur inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000); *see also Roberts*, 325 F.3d at 787 (citing *Wells*). In reviewing the jury instructions in their entirety, we find that these instructions properly informed the jury of the law and what it must find to determine liability. The court did, in fact, instruct the jury to consider the "totality of the circumstances" rather than "looking at each single event" in determining whether the harassment resulted in a hostile work environment. If the jury is instructed to consider the harassment by looking at the totality of the circumstances, then it is logical to assume that, in doing so, the jury would consider all evidence surrounding Meijer's response to the harassment. Certainly Meijer's response cannot be considered without looking at the harassment itself. Additionally, the jury was instructed to decide whether Meijer acted in good faith or acted in a way that was "reasonably calculated to end the harassment." The consideration of reasonableness implies a reasonableness under the circumstances. Finally, the jury was told that it was to consider Meijer's response in light of what it knew at the time that the harassment occurred. Thus, no further direction prohibiting the jury from using hindsight was necessary. All of these factors provided the jury with a sound basis in law. Because the jury instructions were not confusing, not misleading, and not prejudicial, we find no basis for reversal.

## C. Admission of Evidence

We review "the district court's evidentiary decisions for abuse of discretion" and should only reverse when "such abuse of discretion has caused more than harmless error." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994). The harmless error standard "calls for reversal when the appellate court lacks a 'fair assurance' that the outcome of a trial was not affected by evidentiary error." *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004). We shall, therefore, reverse the lower court only if we are "firmly convinced that a mistake has been made." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998).

### 1. Pound's Criminal Conviction

Pound pleaded *nolo contendre* to charges of disorderly conduct that resulted from the knife incident. Before trial, the court granted Meijer's motion *in limine* that would prevent McCombs from introducing evidence regarding Pound's conviction. During her testimony at trial, McCombs made a statement alluding to Pound's conviction. Upon Meijer's objection to that statement, the district court reversed its initial ruling and found that evidence of the conviction could be admitted, as its probative value outweighed its prejudicial effect. Meijer asserts on appeal that the admission of Pound's criminal conviction was prejudicial and should not have been admitted. Meijer also claims that the "improper and inaccurate testimony regarding Mr. Pound's supposed guilty plea greatly bolstered [McCombs's] case." Appellant's Br. at 29.

At trial, McCombs testified that she saw Pound's wife after she was working at a new place of employment. When asked how that made her feel, McCombs responded: "It made me feel devastated because they pleaded guilty and they weren't supposed to be around me." Trial Tr. at 794. This is the only part of the transcript that Meijer references in support of its argument. Immediately after McCombs made this statement, the district court made its ruling to allow that statement into evidence.

The district court's decision to admit the evidence after weighing its probative value against its prejudicial effect was not an abuse of discretion. Meijer was not prejudiced by the jury knowing that Pound had been convicted of a misdemeanor that resulted from the knife incident. Meijer does not argue that the knife incident did not occur; in fact, evidence of the knife incident was admitted through McCombs's written complaint on December 4. Moreover, if Pound himself had been the defendant or if the occurrence of the knife incident was at issue, the situation may have been different.[11] But, as the district court properly concluded, it does not "hurt[ ] Meijer[] at all to know the man was convicted." J.A. at 677. We cannot say that this was an evidentiary error, and even if it were, the outcome was not affected by such error.

### 2. Expert Testimony

At trial, McCombs called Elizabeth Bjick ("Bjick"), an expert witness, to testify about the psychological impact that McCombs suffered as a result of the harassment. Meijer objected, arguing that Bjick was not permitted to testify as an expert because she was a "trainee" and not yet a licensed psychologist. The district court allowed her testimony, and Meijer now argues that this testimony was prejudicial error.

Under Ohio law, a person must be a licensed psychologist to "engage in the practice of psychology for compensation or other personal gain." Ohio Rev. Code § 4732.21(A). There are

---

[11]Under Ohio law, "[a] plea of 'no contest' or words of similar import shall not be construed as an admission of any fact at issue in the criminal charge in any subsequent civil or criminal action or proceeding." Ohio Rev. Code § 2937.07.

several exemptions, however, including an "unlicensed person holding a master's degree or doctoral degree in psychology from a program approved by the board, while working under the supervision of a licensed psychologist." *Id.* § 4732-5-02(B)(4). As indicated in her testimony, Bjick worked under the supervision of another licensed psychologist, Dr. Virginia Reid, who, in fact, signed all of Bjick's diagnoses and treatments. Meijer does not offer authority that requires Dr. Reid to be present while Bjick testified about her opinion regarding McCombs—the opinion that she had established under the supervision of Dr. Reid. Because Bjick conducted her work while supervised by Dr. Reid as allowed under the statute, we find that the district court did not abuse its discretion in allowing Bjick to testify without Dr. Reid being present in the courtroom.

### 3. Meijer's Annual Gross Sales

Meijer argues that the admission of its annual gross sales was prejudicial error. Meijer, however, not only fails to demonstrate prejudice, but also does not provide authority for its conclusion. In fact, the Supreme Court of Ohio has indicated that, while it is not required, "a defendant's net worth may be considered by the fact-finder in determining appropriate punitive damages . . . ." *Wagner v. McDaniels*, 459 N.E.2d 561, 564 (Ohio 1984). Meijer contends that allowing this evidence fostered an impression that it has "access to vast resources" and also notes that "a company with a large cash flow may in actuality operate at a loss or even be bankrupt." Appellant's Reply Br. at 18 (citation omitted). Meijer's argument is purely hypothetical; Meijer does not assert that it was *actually* prejudiced by the admission of its annual sales and that it cannot afford the damages awarded. Because there was no prejudice, we find that the district court did not abuse its discretion when it allowed this information to be admitted into evidence.

### D. Attorneys' Fees and Costs

We review an award of attorneys fees under the same standard as evidentiary determinations and will therefore "usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion." *Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 672 (6th Cir. 1988).

### 1. Attorneys' Fees Awarded From Trial

A Magistrate Judge is not permitted to determine costs or fees, but may make a report and recommendation to the district court on such issues. *Massey v. City of Ferndale*, 7 F.3d 506, 510-11 (6th Cir. 1993). After being presented with the Magistrate Judge's report and recommendation, the district court must then conduct a de novo review of the findings and issue an order as it sees fit. *Id.* at 510. The district court cannot simply "concur" in the magistrate's findings, but it must conduct its own review in order to adopt the recommendations. *Id.*

In this case, on November 22, 2002, the Magistrate Judge issued a report and recommendation in which he found that McCombs should recover $460,450 in attorneys' fees, $4,532.50 in expert witness fees, and $10,103.34 in costs. Subsequently, on April 28, 2003, the district court issued an order mandating that McCombs recover her fees and costs in the exact same amount recommended by the Magistrate Judge. In its order, the district court specifically stated that it "reviewed the comprehensive findings of the Magistrate Judge and considered de novo all of the filings in this matter." J.A. at 471.

Meijer argues that the district court did not conduct its own review of the evidence. This argument is contrary to the district court's own order, in which it indicated that it "considered de novo all of the filings." Simply because Meijer is unsatisfied with the outcome does not mean that the district court failed to review the entire record.

Meijer also argues that the district court failed to consider several factors, including: adequate documentation of fees, reasonableness of attorneys' fees, comparable hourly rates, and

reduction based on results. The Supreme Court has advised that counsel "is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983). In this case, the district court found that the entries made by McCombs's counsel were sufficient even if the description for each entry was not explicitly detailed. Regarding the reasonableness of fees, including counsel's hourly rate, "[i]t remains for the district court to determine what fee is 'reasonable.'" *Id.* at 433. Again, while Meijer maintains that the district court erroneously determined the hourly fees as well as the reasonableness of fees, the district court explained how it reached its decision, finding that many "lawyers would be unable to work on Plaintiff's case for a lengthy period of time without interim payments and many would be unwilling to undertake the risk involved." J.A. at 446. In particular, the court stated: "our experience in presiding over settlement discussion in these types of cases leads us to express no shock at the hourly rates charged in this case." *Id.* Moreover, the district court reduced the attorneys' fees whenever it found that there were excessive or unreasonable charges.[12] Finally, "a fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435. The Supreme Court indicated that a district "court necessarily has discretion in making this judgment." *Id.* at 436. In the instant case, the district court found that even though McCombs did not prevail on her retaliation claims, "there is no basis to make the fees proportionate to the successful claim because the quantum of work would be approximately the same." J.A. at 451.

"[T]he district court has discretion in determining the amount of a fee award[, which] is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437. In reviewing the decision that was reached by the Magistrate Judge and then adopted after a de novo review by the district court, we find no indication that the court abused its discretion in awarding the recommended amount of attorneys' fees.

### 2. Costs Awarded From Trial

Meijer appeals both the award of expert witnesses fees and the general court costs. Of the $9,482.00 in McCombs's expert witness fees, the district court awarded $4,532.50. The district court found that one of the three witnesses used did not advance McCombs's case, and therefore his fees could not be recovered. The fees for the other two witnesses, however, could be recovered. Meijer's argument that the billing was not thoroughly detailed is without merit. The invoices presented general descriptions of the charges and included the time spent for fees incurred. The district court did not abuse its discretion in granting fees for two of the three expert witnesses.

Meijer also argues that deposition costs cannot be recovered because the depositions were not used at trial and the costs were not properly itemized. Both of these arguments fail under the law in this jurisdiction. First, "a deposition does not have to be used as evidence to be taxed as an expense." *Baker v. First Tenn. Bank Nat'l Ass'n*, 1998 WL 136560, at **3 (6th Cir. Mar. 19, 1998). McCombs may recover for costs incurred taking depositions, even if they were not used at trial. Second, as indicated by the district court, the costs were itemized in a supplemental affidavit supplied by counsel. Thus, the district court did not abuse its discretion in awarding costs to McCombs.

---

[12]For example, attorney John H. Metz submitted a bill totaling 378.8 hours of work. Based both on its own calculation of Metz's billing statement and in response to Meijer's specific objections, the court reduced that amount to 280.5 hours. J.A. at 452. Similarly, attorney Patrick J. Perotti submitted a bill totaling 1177.6 hours of work, which the court reduced to 1142.6, and attorney Richard N. Selby, II, submitted a bill totaling 521.6 hours of work, which the court reduced to 518. *Id.*

### 3. Supplemental Attorneys' Fees Awarded Post-Trial

Supplemental attorneys' fees can be awarded in the same manner as attorneys' fees. *See Brock v. UAW*, 1991 WL 124924 (6th Cir. July 10, 1991) (permitting supplemental fees for additional work completed after initial award). In such cases, this court has found that "[t]he trial judge in determining the value of services rendered by lawyers who have tried a case before him ordinarily has an infinitely better opportunity to evaluate those services than does an appellate court." *Id.* at *1 (citing *Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974)).

In its separate appeal of the district court's award of supplemental attorneys' fees, Meijer argues that McCombs's counsel should not be compensated for unsuccessful and unnecessary post-trial discovery, for the entirety of work in attempting to recover attorneys' fees from trial verdict, and at such an excessive rate. The district court articulated valid reasons for each of its decisions regarding these arguments. Specifically, the post-trial discovery related to attorneys' fees and costs resulted in an award totaling over $460,000. The attorneys' work, therefore, was not "unsuccessful" as Meijer would have this court believe. The post-trial work included McCombs successfully defending Meijer's motion for judgment on the pleadings and motion for a new trial. Last, the district court refers to the analysis in its earlier order regarding the attorney's hourly rate of $175, which we have already indicated is an acceptable rate in this case. For these reasons, we do not find that the district court abused its discretion in awarding supplemental attorneys' fees.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision as to all issues.

————————————

**DISSENT**

————————————

RONALD LEE GILMAN, Circuit Judge, dissenting.  The jury's verdict reflects its conclusion that there was no "past history" of Pound's harassment prior to McCombs filing her written complaint on November 25, 1997.  From that point forward, there is insufficient evidence for any reasonable juror to find that Meijer's subsequent response was reckless, indifferent, or unreasonable.  Furthermore, even if the compensatory verdict were allowed to stand, the award of punitive damages in this case is totally beyond the pale.  I would therefore reverse the district court's denial of Meijer's renewed motion for a judgment as a matter of law and direct the district court to enter judgment in favor of Meijer.

I.       **The jury's determination in favor of Meijer on McCombs's Ohio common-law sexual harassment claim is fully supported by the evidence**

In the present case, the jury was instructed on three sexual harassment charges: a Title VII claim, an Ohio statutory claim, and an Ohio common-law claim.  Although the instructions to the jury on the Ohio statutory claim and the Title VII claim were identical, the Ohio common-law claim required proof of a fifth element—that the accused employee had "a past history of harassment about which the employer knew or should have known." *Bell v. Cuyahoga Cmty. Coll.*, 717 N.E.2d 1189, 1193 (Ohio Ct. App. 1998).  Thus, in order to prevail on her Title VII and state statutory claims, McCombs's burden was limited to proving that Meijer's response after it received written notice of Pound's harassing behavior was reckless, indifferent, or unreasonable. *See Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997).  McCombs's counsel reiterated this point during closing arguments, advising the jury that if it found that "she never said anything until November," when McCombs filed her written complaint, but that Meijer failed to respond appropriately, the jury could still properly impose liability on Meijer.  By contrast, in order to find for McCombs on her Ohio common-law claim, the jury had to find that a pattern of harassment existed prior to McCombs's first written complaint in November and that Meijer knew or should have known about this harassment.

That the jury found against McCombs on her Ohio common-law claim of sexual harassment establishes that it did not believe that Pound's isolated verbal statements to McCombs rose to the level of sexual harassment prior to her written complaint in November.  The majority attempts to explain away the jury's finding by pointing to the fact that the Ohio courts "have not determined a precise definition of 'past history'" as that term is used in the Ohio common-law sexual harassment charge.  Maj. Op. at 5.  They suggest that the jury might have interpreted the  instruction—that "McCombs must show that the employee had a past history of gender harassment about which Meijer knew of should have known"—as requiring that McCombs show that Pound had a history of harassing *other* women prior to his harassment of McCombs.  If the jury instruction cited by the majority were the only mention of "past history" before the jury, this argument would have more force.  During closing argument, however, McCombs's counsel explained to the jury that "[u]nder the common law of Ohio we have to show a history.  Certainly, May through December is a history, and *that's all that means* is that this wasn't just a one-time thing, that, yes, there's been a history of this gentlemen over and over and over again from May."  (Emphasis added.)

The jury's finding against such a history from "May through December" is well supported by the evidence.  Despite McCombs's isolated complaints about Pound's comments to her between May and November of 1997, her testimony establishes that during this same period of time she "became William[ Pound]'s friend."  McCombs went to Pound's home on two different occasions in August to help him clean and prepare for the arrival of his new baby.  And when the baby arrived

in late August, McCombs gave Pound's wife a baby gift, either dropping the gift by Pound's home or giving the gift to Pound himself. Pound's conduct was apparently acceptable to McCombs even into late October, when "he and his kids came over for Halloween."

McCombs did not use Meijer's written complaint procedure to call attention to Pound's conduct until November 25, 1997. Although she had complained orally to Meijer personnel on a few occasions prior to this time, she never followed up in writing. Yet McCombs was well aware of Meijer's written complaint policy because, during this same time period, she used it to file a report against another male coworker whose conduct she considered to be sexual harassment—writing that he would "come up from behind and with both hands, grab my side."

Even as late as November 23, 1997, when Pound approached McCombs and asked if she could take a break with him, she replied, "If I can, sure." While the two were walking back from this break, Pound touched McCombs's buttocks. She later testified that this incident was the triggering event that led her to conclude that Pound's behavior had finally "crossed the line." McCombs's actions and her testimony concerning her friendly relationship with Pound before this incident plainly support the conclusion that McCombs had not expected Meijer to take any action against Pound prior to this time. This reality is reflected in the jury's decision in favor of Meijer on the Ohio common-law claim of sexual harassment.

**II.     The jury's compensatory award in favor of McCombs, based upon Meijer's conduct between November 25, 1997 and December 6, 1997, is not supported by the evidence**

In finding for McCombs on her Title VII and Ohio statutory sexual harassment claims, the jury's award of compensatory damages must have been premised on its determination that Meijer's response following McCombs's written complaint was recklessness, indifferent, or unreasonable. *See Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997) (stating that where a coworker is harassing a fellow worker, "[t]he act of discrimination by the employer . . . is not the harassment, but rather the inappropriate response to the charges of harassment").

McCombs filed her first written complaint against Pound at 10 p.m. on November 25, 1997. The following morning, the day before Thanksgiving, Meijer began its investigation of McCombs's allegations. Representatives from Meijer's Labor Relations Department questioned Pound and took a written statement from him. At the conclusion of his interrogation, Pound was instructed not to speak to McCombs again. The investigation continued over the holiday weekend, during which time Meijer interviewed McCombs's direct supervisor and another coworker, whom McCombs said could corroborate her complaints regarding Pound. Meijer officially reprimanded Pound on the following Monday, December 1, 1997, and warned him that "any further actions such as he had displayed in the past would result in his termination and that [Meijer] would not tolerate any type of retaliation" by Pound against McCombs.

On December 3, 1997, Pound and McCombs worked together without any reported problems until the end of McCombs's shift, when she filed a written complaint alleging that Pound "keeps looking at me." Before beginning work the next morning, on December 4, 1997, McCombs filed a third written complaint, wherein she recounted "the knife incident" that she had omitted from her complaint filed the previous evening. Meijer responded by immediately transferring Pound to another department. After Meijer conducted a two-day investigation into McCombs's complaints, Pound was suspended on December 6, 1997 and later terminated, without ever returning to work.

The entire lapse of time between McCombs's initial written complaint and Pound's suspension, including the long Thanksgiving holiday weekend, was only 11 days. As the majority impliedly concedes, if Meijer is charged with knowledge of Pound's harassment only as of the date of McCombs's first written complaint, then no reasonable juror could find that Meijer's subsequent

response was so deficient as to subject it to liability for sexual harassment. Maj. Op. at 6 (rejecting Meijer's claim that its response was appropriate because "Meijer's assertion is based on the notion that it was unaware of Pound's behavior until November 25 . . . [but] we have indicated that a jury could reasonably find that Meijer knew of the behavior prior to the first written incident").

The jury's finding in favor of McCombs on the Title VII and Ohio statutory claims of sexual harassment is therefore totally unsupported by the record. Granting a motion for judgment as a matter of law under Rule 50(b) is proper under these circumstances. *See, e.g., Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 314 (6th Cir. 2004) (directing the district court to grant the defendant's motion for judgment as a matter of law where the jury's damage award was "unsupported in law or fact"); *McCurdy v. Montgomery County*, 240 F.3d 512, 517 (6th Cir. 2001) (instructing the district court to grant a motion for a judgment as a matter of law where there was a "complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party") (citation and quotation marks omitted). I would therefore direct the district court to grant Meijer's renewed motion for judgment as a matter of law under Rule 50(b).

### III.   The jury's award of punitive damages and the court's award of attorney fees are totally unjustified

The jury awarded McCombs $100,000 in punitive damages with respect to her Ohio statutory claim of sexual harassment, meaning that it found that McCombs had proven by clear and convincing evidence that Meijer exhibited "actual malice" in responding to her complaints. Ohio Rev. Code Ann. § 2315.21(C). Actual malice exists under Ohio law where a defendant engages in conduct with "a conscious disregard for the rights and safety of other persons that has a great possibility of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1174 (Ohio 1987). In order to recover punitive damages, McCombs had to prove that Meijer had actual "subjective knowledge of the danger posed" by Pound. *Malone v. Courtyard by Marriot, Ltd. P'ship.*, 659 N.E.2d 1242, 1243 (Ohio 1996).

There is no way, in my opinion, for the punitive damage award to stand. Based on the jury's determination in favor of Meijer on McCombs's Ohio common-law claim of sexual harassment, McCombs's entire case hinges on what transpired during the 11 days between her November 25, 1997 written complaint and Pound's last day of work on December 6, 1997. For the reasons stated above, the evidence of Meijer's actions during this short period of time does not permit a finding that its response was reckless, indifferent, or unreasonable, much less a finding that it was guilty of actual malice. McCombs, in short, produced absolutely no evidence that Meijer had actual knowledge of any danger posed by Pound that it failed to timely act upon. I would therefore vacate the award of punitive damages. Needless to say, I would also vacate the award of more than $460,000 in attorney fees to McCombs's counsel.

### IV.  Conclusion

For all of the reasons set forth above, I would reverse the district court's decision to deny Meijer's Rule 50(b) motion and remand the case with instructions to dismiss McCombs's complaint.