NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0173n.06
Filed: March 7, 2005

No. 03-2340

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Christine R. Nievaard, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| City of Ann Arbor, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: GIBBONS and ROGERS, Circuit Judges, and BUNNING, District Judge.**[*]

**ROGERS, Circuit Judge.** Plaintiff Christine Nievaard appeals the grant of summary judgment issued in favor of her former employer, the Defendant City of Ann Arbor ("the City"), on Nievaard's claim that she was subject to a hostile work environment based on her sex. Because the City made a good-faith effort to address Nievaard's complaints of harassment, the grant of summary judgment is affirmed.

**I. Background**

---

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

In January of 2001, Nievaard applied with the City of Ann Arbor for the position of Parks Maintenance Foreperson. She was hired for the position on or about April 2, 2001. Nievaard's position required her to supervise five employees, both male and female, who were responsible for installing and maintaining playground equipment, fencing, and athletic fields for various parks throughout the city. Nievaard also interacted with employees from crews that she did not supervise. Nievaard claims that she experienced sexual harassment almost immediately after starting work. Specifically, Nievaard claims that, as a result of being the first female in the position of maintenance supervisor, she experienced harassment based on her sex. She cites several incidents of alleged harassment, most of which involve non-sexual conduct.

**A. Alleged Incidents of Harassment**

Nievaard claims that the first incident of alleged harassment occurred the day after she was hired, when, according to Nievaard, one of the Parks Department employees told Nievaard that he would have a hard time working for a woman because of his religious beliefs. Nievaard further alleges that, during her period of employment with the City, other employees engaged in the following actions based on her sex: (1) questioned her competence, decisions, and orders on a daily basis; (2) were insubordinate on a daily basis; (3) called her names such as "bitch;" (4) spread rumors about her relationship with various employees and made allegations of sexual promiscuity; (5) made daily comments about her appearance and clothing, (6) slipped a note with the word "superbitch" under her door; (6) "keyed" her personal and work vehicles; (7) accused her of writing a racial slur in the bathroom of the Parks and Recreation building; and (8) evaluated her unequally

when compared to another allegedly similarly situated probationary employee. Nievaard complained to the City about these incidents in July 2001, alleging that she was experiencing harassment based on her sex.

Nievaard alleges, however, that complaining did not stop the harassment. For instance, in May of 2002, Nievaard's door was glued shut on three separate occasions. Nievaard also claims that, after the City hired Terry Rynard as the manager of the City's Parks and Forestry Department on May 6, 2002, the following discriminatory events occurred: (1) she was told that she could not work a prearranged shift that gave her Mondays off; (2) she was told by Rynard that she lacked "integrity;" (3) she was asked by Rynard if she had used a work vehicle for personal business, when she had not; (4) she was questioned about making personal calls on her work-issued cell phone and told she may be disciplined for such behavior, even though her prior supervisor had told her the cell phone could be used for personal calls; (5) she was told by Rynard that she was lying about not using a work vehicle for personal use; (6) she was given a list by Rynard of areas to improve in, which included honesty and integrity; (7) she was told that she must have her cell phone turned on at all times or she would be denied the use of a City vehicle to and from work; (8) she was told she may not get to take off vacation time that she had previously scheduled, because it was another supervisor's regular day off; and (9) she was given a written warning by Rynard for personal use of the cell phone and told she had to pay the City approximately three hundred and sixty dollars or face discipline. Ultimately, Nievaard was terminated for job abandonment on July 1, 2002.[1]

---

[1]The plaintiff does not bring a claim of retaliatory discharge.

**B. The City's Response to Nievaard's Allegations of Harassment**

Upon Nievaard's complaint to the Human Resources Department ("HR"), an investigation was undertaken and the HR department "quickly confirmed . . . the fact that Nievaard was being subjected to a hostile work environment, due to her gender." In making a finding of gender-based harassment, the HR department relied on the fact that Nievaard had been subject to rumors about her relationships, comments about her appearance and clothing, questions about her competence, questions about her decisions and orders, insubordination by various employees, name calling (including "bitch"), her personal and work vehicles being "keyed," having a note slipped under her door with "superbitch" written on it, and a probationary evaluation that was inconsistent with the treatment of another recent probationary supervisor. Ultimately, the HR department found that, "the problem can not be pinned on one person, but rather on an attitude that has been allowed to pervade the workplace at [the Parks and Recreation Headquarters]."

After determining that Nievaard had been the subject of harassment based on gender, the HR department made several attempts to eliminate the harassment, to educate Parks and Recreation management about the City's Policy 404, which prohibits discrimination and harassment, and to provide support to Parks and Recreation management in uniformly enforcing the policy. A memo written by HR Director Dave Ferber sets forth the numerous actions taken by the HR Department in response to Nievaard's complaints. They include the following: (1) on August 8, 2001, the HR department held a two hour training session on Policy 404 for Parks and Forestry management who

worked at the Parks and Forestry Headquarters;[2] (2) on August 15, 2001, the HR department met with supervisors from the 415 Building to go over Policy 404 again and to instruct them in how to inform their employees about the policy; (3) on August 16, 2001, and August 23, 2001, the HR department met with each division and work group to go over Policy 404 and to discuss the consequences of violating the policy; (4) on August 20, 2001, the HR department met with all Parks employees at the 415 Building about Policy 404; (5) on August 15, 2001, the HR department held numerous individual meetings with employees; (6) on various dates, the HR department held meetings with union officers from AFSCME Local 369 to discuss the situation with Nievaard; (7) the HR department provided support to the management staff of the Parks Operation and Forestry Division, as well as the Assistant Superintendent of Parks and Recreation, to ensure consistent enforcement of Policy 404; (8) the HR department provided Nievaard with support services, such as personal counseling by outside consultants, daily consultations about how to handle various situations, offers to repair her damaged vehicle, and other support as needed; (9) discipline was imposed on one manager and two supervisors in the Forestry division for their involvement in the harassment; and (10) a seasonal employee was terminated for violation of Policy 404.  In addition to these measures, an employee supervised by Nievaard, who had been accused of insubordination by Nievaard, was transferred to another supervisor.

---

[2]The Parks and Forestry Headquarters, located at 415 W. Washington St., is alternately referred to by the City as "415 W. Washington," "the 415 Building," or simply "415."

Ultimately, however, the HR Department conceded that "[d]espite all of these actions, selected supervisory personnel and hourly employees are increasingly directing harassing comments and initiating extremely negative rumors towards Nievaard." The HR Department felt the harassment was continuing because of a lack of cooperation and follow-through by Parks Department management. A memo issued by the HR department ultimately came to several conclusions about the situation involving Nievaard:

1. Nievaard continues to be subjected to a hostile and harassing work environment. . . .

2. Human Resources has attempted to support the Parks Department in eliminating the harassment and resolving the issues at 415. However, it has become clear that our advice and suggestions are being disregarded.

3. As is true throughout the City, Human Resources has the responsibility for advising departments about how to accurately and effectively enforce policies related to Human Resources issues (such as harassment). However, HR cannot do the enforcement ourselves. The responsibility and accountability for ensuring compliance with policies falls to each department.

4. . . . Without this kind of action it is our view that the harassment will continue unabated and will result in legal action against the City and Parks management.

5. Parks Operations and Forestry management staff, as well as Parks Department senior management, ceased enforcing Policy 404 and taking a proactive approach to stop the on-going harassment directed at [Nievaard] by the beginning of September.

6. At this time, HR's ability to enforce Policy 404 at 415 W. Washington has been completely undermined by the lack of follow-through by the Parks Department. HR has consistently tried to protect the City from liability while at the same time

attempted to stop the harassment. At this time we feel we have no more to offer on this situation, until such time as follow-through and accountability issues within Parks are resolved.

7. Parks Department's lack of initiation and maintenance of an appropriate level of action to effectively stop the daily harassment directed at [Nievaard] could subject the City and Parks management to possible civil litigation.

Despite the conclusions of the HR Department, the district court found that Nievaard had "failed to show that much of what she complains [of] stems from anything other than personal animosity or specific disagreements and misunderstandings between her and her co-workers." Thus, the court found that "[m]any of Plaintiff's allegations amount to what are clearly discrete misunderstandings or disagreements not based on any gender discrimination." The district court then determined that four of Nievaard's allegations did occur because of sex: (1) two employees calling Nievaard a "bitch" and the anonymous note calling her a "superbitch;" (2) "wolf whistling" by an employee that she saw rarely; (3) an employee putting his arm around Nievaard and telling her she was "sexy;" and (4) an employee's statements that if Nievaard pulled down her shirt a little more the workers could have a "view all day" and that Nievarrd's shirt was "too tight." The district court only considered these incidents in analyzing whether Nievaard had experienced a hostile work environment. The district court stated that it was "doubtful" that these incidents amounted to either serious or pervasive harassment; however, it ultimately failed to reach the issue. Instead, the district court relied on the City's "prompt and adequate remedial measures" as a basis for granting the City's motion for summary judgment. It is from this judgment that plaintiff appeals.

## II. Analysis

Although we assume for purposes of argument that Nievaard has presented genuine questions of material fact regarding whether certain incidents of harassment were based on her sex, and whether the harassment was severe or pervasive, we nonetheless affirm the grant of summary judgment because the City made a good-faith effort to respond to the harassment.

We review the district court's order granting summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A "material" fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). This court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Nievaard alleges that she was discriminated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, specifically, that she was subject to a hostile or abusive working environment because she experienced repeated harassment based on her sex. Under Title VII, an employee alleging a hostile work environment based on sexual harassment must show the following: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged

sexual harassment created a hostile working environment; and (5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *see also Williams v. General Motors Corp.*, 187 F.3d 553, 560-61. (6th Cir. 1999).

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation and citation omitted). Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim . *Id*. at 21-22.

The City of Ann Arbor alleges that Nievaard has failed to establish a claim of a hostile work environment because she has failed to prove that the harassing incidents were motivated by her gender, that the incidents were severe or pervasive, or that the City did not respond adequately to Nievaard's complaints. Despite the City's argument, we assume without deciding that Nievaard has established a genuine question of material fact regarding whether at least some of the harassing incidents that she experienced were because of sex. In addition, we assume without deciding that Nievaard has established a genuine question of material fact regarding whether the harassment she experienced was severe or pervasive. However, Nievaard has failed to establish that the City did not respond promptly and adequately to her complaints; thus, the grant of summary judgment in favor of the City was proper.

As discussed above, the five-part showing used to demonstrate a hostile work environment based on sexual harassment includes a requirement that there be employer liability. It is this requirement that Nievaard fails. The standard for employer liability differs depending upon the identity of the alleged harasser, with a distinction drawn between co-worker harassment and harassment perpetrated by a supervisor. Because "[e]mployer liability for co-worker harassment is based directly on the employer's conduct," an employer is only liable "if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'" *Hafford*, 183 F.3d at 513 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994)). But in the case of harassment committed by a supervisor, an employer's liability is vicarious. *Id.* In such a case, the employer must demonstrate that it "'exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

Although Nievaard alleges that she was harassed by both co-workers and by a supervisor, the harassment attributed to her supervisor Terry Rynard was not because of Nievaard's sex, and accordingly, cannot form the basis of a hostile work environment claim. Nievaard stated that she felt that Rynard questioned her integrity, and questioned her about her personal use of a city-issued

cell phone and truck, in an attempt to force Nievaard to resign in retaliation for her complaints.[3] In

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790-91 (6th Cir. 2000), this court held that

conduct alleged to have occurred in retaliation for complaints made about a hostile work

environment can not be figured "into the hostile working environment equation," because such

incidents are not alleged to have occurred "because of sex." Therefore, they cannot be considered

when determining whether Nievaard experienced a hostile work environment. Nievaard also alleges

that Rynard discriminated against her based on gender when Rynard told her that if she wanted to

fit in, she should dress less femininely. In *Courtney v. Landair Transport, Inc*., 227 F.3d 559, 564

(6th Cir. 2000), however, this court held that "[a] manager's warning, without more, that plaintiff's

clothing is inappropriate in the workplace is not sexual harassment." Here, Nievaard has not

demonstrated that these particular comments about her dress were anything more than a legitimate

concern about the appropriateness of her attire. Therefore, the comment made by Rynard also

cannot be considered in determining whether Nievaard has established a hostile work environment.

Accordingly, the only remaining alleged harassment that may have been because of sex is

that alleged to have been committed by Nievaard's co-workers. For summary judgment purposes,

Nievaard has established a genuine issue of material fact regarding whether at least some of these

harassing incidents were committed because of her gender. This is because not only were some of

the incidents clearly based on Nievaard's sex, such as an employee commenting that he would have

---

[3]Again, although Nievaard alleges that there was a campaign to get her to resign in retaliation for her complaints, she does not allege a claim of retaliatory discharge in her complaint.

a hard time working for a woman, but in addition, "[n]on-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, [s]he would not have been the object of harassment." *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000). As mentioned above, this court assumes without deciding that these harassing incidents constitute a hostile work environment. It is not necessary to reach that question, because, with only co-worker harassment at issue, Nievaard cannot demonstrate employer liability where the City took sufficient action to redress Nievaard's complaints.

To reiterate the standard, "[e]mployer liability for co-worker harassment is based directly on the employer's conduct," and an employer can only be held liable "if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'" *Hafford*, 183 F.3d at 513 (quoting *Pierce*, 40 F.3d at 804). In this case, it is undisputed that the City knew of the alleged harassment. Thus, the only remaining issue is whether the actions taken by the city were "prompt and appropriate." In determining whether a response was "prompt and appropriate," negligence in fashioning a remedy is not sufficient for the employer to incur liability. *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997). Rather,

> [t]his court has found that when the allegations of sexual harassment involve a coworker and the employer has fashioned a response, the employer will only be liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment." Thus, an employer who implements a remedy "can be liable for sex discrimination in violation of Title VII only if that remedy exhibits

such indifference as to indicate an attitude of permissiveness that amounts to discrimination."

*McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005) (quoting *Blankenship*, 123 F.3d at 873) (internal citations omitted).

The City argues that it responded appropriately to Nievaard's complaints because, upon learning of the alleged harassment, it met with city employees on numerous occasions to discuss Policy 404, it conducted training on Policy 404, it provided Nievaard with assistance in dealing with the harassment, and it disciplined certain employees who were identified as having engaged in harassing behavior, as discussed more extensively *supra*. Nievaard responds that, while the *HR Department* did attempt to remedy the harassment, the lack of cooperation by the *Parks Department* prevented such attempts from being implemented. In support of this, Nievaard cites the memo prepared by the HR department, which concludes that "it has become clear that our advice and suggestions are being disregarded," and that Parks Management "ceased enforcing Policy 404 and taking a proactive approach to stop the on-going harassment directed at [Nievaard]." Thus, Nievaard argues, the actions taken by the HR Department cannot insulate the City from liability if another division of the City, the Parks Department, caused these remedial efforts to be unsuccessful.

While the response taken to Nievaard's complaints did not eliminate the problem entirely, Nievaard does not allege that the HR Department's response was not undertaken in good faith. As noted previously, mere negligence in fashioning a response is not sufficient to hold an employer

liable. *Blankenship*, 123 F.3d at 873. Rather, the employer's response will be considered inadequate "'only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.'" *McCombs*, 395 F.3d at 353 (quoting *Blankenship*, 123 F.3d at 873). In this case, because the City actually made several attempts to remedy the discrimination, the City has not exhibited "such indifference as to indicate an attitude of permissiveness that amounts to discrimination." Imposing liability in the face of such an extensive and good-faith attempt to remedy the problem would run contrary to the underlying theory of the claim itself, that the "'act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment.'" *Id.* (quoting *Blankenship*, 123 F.3d at 873).

### III. Conclusion

Because the City took prompt and appropriate remedial action in response to Nievaard's complaints of co-worker harassment, there is no "employer liability" for the alleged harassment. Accordingly, even assuming that Nievaard has met the other elements of a claim of hostile work environment based on sexual harassment, Nievaard's claim fails as a matter of law. The district court's decision granting the City's motion for summary judgment and dismissing the case is therefore affirmed.

**JULIA SMITH GIBBONS, Circuit Judge, dissenting.** Because I believe that a genuine issue of material fact exists regarding whether the City adequately responded to Nievaard's complaints, I respectfully dissent.

Certainly, the Human Resources Department took prompt and significant steps to respond to Nievaard–steps that would be "prompt and adequate" as a matter of law if the evidence consisted *only* of these steps. The record in this case, however, also includes evidence that managers in the Parks Department disregarded the advice of the Human Resources Department and undermined its actions, thus allowing the harassment to continue. The actions of the Parks Department managers are no less attributable to the City than those of Human Resources Department personnel. Moreover, there is evidence that Human Resources Department personnel were fully aware of the lack of cooperation by the Parks Department; yet no evidence exists that Human Resources sought to inform higher level city officials of the Parks Department's position. Thus, a reasonable trier of fact could find the City's response inadequate based on either the Parks Department's actions or the Human Resources Department's lack of action, or both.

The majority accurately cites the case authority applicable to determining whether a response was "prompt and adequate." The flaw in its reasoning is in looking only at the positive actions of the Human Resources Department. Surely, a jury could find that the Parks Department's actions, which are actions of the City to the same extent as those of Human Resources, could be characterized as amounting to more than mere negligence. Indeed, the actions of the Parks Department in this case could fairly be said to manifest "culpable indifference," in that the Parks

Department "exhibit[ed] such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872-73 (6th Cir. 1997); *see McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005). Similarly, a jury could find that the failure of the Human Resources Department to seek resolution at a higher level was likewise more than negligence, but instead rose to the level of culpable indifference, given the evidence of its awareness of the Parks Department's position. For these reasons, I would reverse the grant of summary judgment to the City of Ann Arbor.