RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KEVIN HAMM,

*Plaintiff-Appellant,*

*v.*

PULLMAN SST, INC.,

*Defendant-Appellee.*

No. 25-1617

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-11456—David M. Lawson, District Judge.

Argued: January 28, 2026

Decided and Filed: February 12, 2026

Before: GILMAN, GRIFFIN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Nanette L. Cortese, THE CORTESE LAW FIRM, PLLC, Bingham Farms, Michigan, for Appellant. Karel Mazanec, VENABLE LLP, Washington, D.C., for Appellee. **ON BRIEF:** Nanette L. Cortese, THE CORTESE LAW FIRM, PLLC, Bingham Farms, Michigan, Scott P. Batey, BATEY LAW FIRM, PLLC, Bingham Farms, Michigan, for Appellant. Karel Mazanec, VENABLE LLP, Washington, D.C., for Appellee.

───────────────

## OPINION

───────────────

MURPHY, Circuit Judge. Kevin Hamm says that his coworkers at Pullman SST, Inc., ridiculed him for months after they learned he was bisexual. When Hamm formally reported this abuse, an HR employee interviewed nine of his coworkers. All nine denied harassing Hamm or witnessing harassment. Although the HR employee could not corroborate Hamm's claims, she

still decided to require all employees to review Pullman's antidiscrimination policy as a preventative measure. She also agreed to transfer Hamm to a new worksite and allowed him to take medical leave. While on leave, though, Hamm raised concerns with all the alternative assignments offered to him. Pullman thus terminated Hamm. He sued Pullman under Title VII and Michigan law, claiming that the alleged abuse created a hostile work environment and that the termination was in retaliation for his sexual-harassment complaint. The district court rejected both claims at the summary-judgment stage. It correctly held that Hamm could not hold Pullman liable for the abuse because it took proper actions upon learning of his allegations. And it correctly held that Hamm did not present enough evidence to show that Pullman's reason for ending their relationship (his refusal to accept any other job assignment) was pretext for discrimination. We thus affirm.

I

Since high school, Hamm has held several construction jobs in and around Detroit, Michigan. He eventually obtained his certification as a "gunite nozzleman," operating equipment that sprayed concrete onto surfaces. Hamm Dep., R.22-5, PageID 345. Hamm started to work for Pullman in the summer of 2020. Chad Ruff, a Pullman construction manager in the Detroit area, hired Hamm. By October, Hamm had completed several smaller jobs for Pullman and began to undertake the gunite work on its project at Michigan Central Station. Hamm reported to superintendent Brian Martinus and worked alongside several crewmembers at this construction site.

The parties disagree over what occurred at Michigan Central Station between November 2020 and April 2021. According to Hamm, Martinus and his coworkers repeatedly harassed him using homophobic slurs. According to Pullman, nobody used slurs against Hamm, and Martinus complained only about his job performance. Given the case's procedural posture, we will briefly describe Hamm's version of events. *See Howell v. McCormick*, 148 F.4th 834, 843 (6th Cir. 2025).

Hamm alleges that the verbal abuse started in November or early December. At that time, he told Josh Perez (a coworker) that he was bisexual. Perez "chuckled" and told another

crewmember. Hamm Dep., R.22-5, PageID 355. A short time later, Perez allegedly told Hamm that he "looked like" a "gay faggot" named "Kevin Bacon" (not the actor) who had been brutally murdered in Michigan. *Id.*, PageID 347, 355. Martinus allegedly overheard this conversation and agreed with Perez. Hamm's coworkers also began to regularly refer to him "as Bacon and Kevin Bacon." *Id.*, PageID 347, 353.

Over the next five months, coworkers made many other offensive comments. For example, Martinus would tell Hamm to get his "gay ass" working or say similar things when he thought Hamm was taking a break. *Id.*, PageID 349–50, 356, 358. Other coworkers regularly called him a "faggot." *Id.*, PageID 355–57. They also routinely asked him derogatory questions, such as whether he was "going to make out with" a male coworker. *Id.*, PageID 357. Someone even wrote "fuck Kevin" in the dust build-up on his car. *Id.*, PageID 360–61.

By February 2021, Hamm could no longer take the abuse. On February 12, he allegedly told Ruff over the phone that unnamed coworkers had been calling him "faggot" and referring to him as "Bacon, the gay faggot who was chopped up." *Id.*, PageID 347, 368. Hamm sought to stop the abuse without "get[ting] anybody in trouble," so he mentioned no names. *Id.* Ruff assured him "that he would have a talk with all the guys." *Id.*, PageID 347.

Soon after Ruff spoke with the crew at Michigan Central Station, Hamm thought that his coworkers were "avoiding [him] like the plague" and that Martinus had "turned a new leaf." *Id.*, PageID 368. Yet the coworkers returned to their old ways sometime later. Hamm thus complained to Ruff again in mid-March that he kept "being referred to as a faggot." *Id.*, PageID 359, 369. This time, Hamm named Martinus, Perez, and another coworker as the culprits who had been calling him "Kevin Bacon" or a "fucking faggot." *Id.* Ruff promised to "take care of it." *Id.*, PageID 359.

But the abuse continued. Early in April, Martinus allegedly asked Hamm another derogatory question and called him a derogatory name. Then, on April 29, Hamm ran into Martinus while searching the worksite for supplies. Martinus asked Hamm where he was going. When Hamm explained what he was doing, Martinus "started yelling at" him. *Id.*, PageID 364. Hamm, who had already been suffering from anxiety attacks, responded that he "had to go"

home and "was sick." *Id.* Martinus allegedly retorted: "Get the fuck out of here and go fuck yourself, you fucking faggot." *Id.* Hamm left the Michigan Central Station worksite never to return.

On the same day, Hamm formally complained about the harassment to Pullman's HR department. Grace Jacob, a senior HR manager, promptly investigated. She interviewed Hamm the next day. Hamm described his recent interaction with Martinus. He also said that Martinus and Perez had called him "Kevin Bacon" and "faggot" and otherwise mocked and berated him. Report, R.22-11, PageID 429–30. Hamm did not, however, reveal his sexual orientation or disclose other comments that his colleagues had made.

Jacob next interviewed nine Pullman employees who had allegedly harassed Hamm or known about the harassment. For the most part, these interviews contradicted Hamm's claims. Martinus admitted that he told Hamm to "get the fuck out of here and go fuck [him]self" when Hamm said he was leaving on April 29. *Id.*, PageID 431. But Martinus "emphatically" denied calling Hamm derogatory names. *Id.* And while a few coworkers remembered discussing the Bacon murder, nobody recalled comparing Hamm to Bacon. All nine also disclaimed hearing anyone call Hamm a "faggot" and were "surprised" by his claim. *Id.*, PageID 431–32. When asked why Hamm might have made it, several coworkers sensed that he did "not want to work" and raised concerns about his recurring "outbursts" on the job. *Id.*, PageID 432.

Ultimately, Jacob could not "corroborate" Hamm's claim that other coworkers had violated Pullman's antiharassment policy. *Id.* Still, Pullman decided to take several preventative measures. It issued Martinus a written warning for using inappropriate language in violation of company policies about proper behavior. It required all Detroit field supervisors to attend in-person antiharassment training. And it required all Pullman employees to reread and re-sign the company's antiharassment policy.

On May 3, Jacob called Hamm (and conferenced in Ruff) to convey her investigation's conclusions. In response, Hamm said that he would never work with Martinus or the crew at Michigan Central Station again. Jacob and Ruff agreed to reassign him to another worksite. Hamm also submitted a doctor's note indicating that he needed medical leave until May 10 due

to his anxiety and panic attacks.  Hamm twice extended that leave, once until May 17 and then again until May 24.  Pullman agreed to let Hamm take this repeated medical leave over these three weeks.

While Hamm remained on leave, Ruff called him several times about possible reassignments.  On the first call, Ruff asked Hamm if he would be willing to travel to "Toledo or Cincinnati" worksites.  Hamm Dep., R.22-5, PageID 378.  Hamm lived in Howell, Michigan, and responded with his own question: "Isn't that a little bit of a hike?"  *Id.*  After Ruff said he would look into the mileage, they ended the call.  On the next call, Ruff told Hamm that he planned to place Hamm on a local project starting the following Monday.  Hamm responded that he had gotten another doctor's note placing him on leave "for another week" and so could not work that day.  *Id.*, PageID 379.  Ruff thus told Hamm that he would reach out again "mid-next week" to craft a plan for "the following week."  *Id.*  On a third call, Ruff mentioned a caulking job at another local site that involved working at a height.  But Hamm was "afraid of heights" and said he was "not at all" suited for this job.  *Id.*, PageID 380–81.  When Ruff followed up about Hamm doing an "overhead demo" project, Hamm said that this type of work "hurts [his] shoulders."  *Id.*, PageID 380.  On a fourth call, Ruff proposed a second-shift job at a school that would begin at 4 p.m. the next day.  Hamm, however, had a 3:30 p.m. doctor's appointment that day and another evening appointment a few days later.  Ruff thus said he would "see" what he could "figure out."  *Id.*, PageID 381.

A day or so later, Hamm texted Ruff to explain that his doctor had cleared him to return to work on May 24.  Ruff replied: "Try me Friday afternoon bud!"  Text Messages, R.23-6, PageID 548.  Starting then, Hamm texted Ruff over several days asking about job opportunities.  But he received no response.  Hamm thus turned to Jacob.  He texted her on May 27 asking about his "status" as a Pullman employee and whether he "still" had a job.  Text Messages, R.22-16, PageID 448.  Jacob responded that Hamm had "declined" "several jobs" "for one reason or another" even though "Pullman employees need to be ready, willing, and able to perform various scopes of work assigned to them."  *Id.*, PageID 449.  She added that Pullman considered his refusal to accept work to be a "voluntary resignation" and that "Pullman does not wish to

continue the employment relationship." *Id.* Although Hamm told Jacob that he had not refused work in follow-up texts, she did not respond further.

Hamm sued Pullman under Title VII and Michigan's Elliott-Larsen Civil Rights Act. He alleged that Pullman subjected him to a hostile work environment based on his sexual orientation (and hence his sex). And he alleged that Pullman fired him in retaliation for his sexual-harassment complaint.

The district court granted summary judgment to Pullman on both claims. *See Hamm v. Pullman SST, Inc.*, 2025 WL 792869, at *11 (E.D. Mich. Mar. 12, 2025). The court rejected the hostile-work-environment claim both because the alleged harassment did not rise to the required level and because Pullman took prompt corrective action anyway. *See id.* at *5–7. It rejected the retaliation claim because Hamm failed to show that Pullman's neutral reason for his termination (that he refused several assignments) was pretextual. *See id.* at *9. We review this summary-judgment opinion de novo. *See Smith v. Newport Utils.*, 129 F.4th 944, 948 (6th Cir. 2025).

II

On appeal, Hamm seeks to revive both his hostile-work-environment claim and his retaliation claim. But he lacks sufficient evidence to send either claim to a jury.

A. Hostile Work Environment

Title VII makes it illegal for employers "to discriminate against any individual with respect to his" "terms" or "conditions" "of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long interpreted this language to prohibit sexual harassment in the workplace. *See Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65 (1986). To prevail on this type of hostile-work-environment claim, employees must prove several elements. *See Doe v. City of Detroit*, 3 F.4th 294, 300 (6th Cir. 2021). Among other things, an employee must suffer from sufficiently severe harassment, the harassment must occur because of the employee's sex, and the employer must have engaged in the kind of action or inaction that suffices to hold it liable. *See id.*

Among these elements, the parties do not dispute that the harassment that Hamm allegedly encountered was "because of [his] . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). According to Hamm, the coworkers harassed him because of his *sexual orientation*: bisexual. This theory raises two questions. As for the first question, the Supreme Court has held that employers discriminate against employees "because of their sex" if they fire them because they are gay or lesbian. *Bostock v. Clayton County*, 590 U.S. 644, 659–62 (2020). *Bostock* reasoned that an employee's sex qualifies as a but-for cause of this termination because the employer would not have made the decision if the employee had been of the opposite sex. *See id.* at 660. Does *Bostock*'s but-for logic also prohibit employers from discriminating against those who are bisexual? *Cf. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 921, 940 (5th Cir. 2023). As for the second question, it is not clear that Hamm's coworkers would have harassed him if he had been a bisexual female. So was the harassment really because of his sexual orientation or just because of his sex? *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–79 (1998). Ultimately, we need not resolve these questions because Pullman raises no argument about this element. We thus will assume that the alleged harassment arose "because of" Hamm's "sex" under Title VII.

Pullman instead challenges whether Hamm has satisfied two other elements. The company first argues that Hamm failed to show an egregious enough level of harassment. The Supreme Court has held that Title VII does not enact a "general civility code for the American workplace." *See Oncale*, 523 U.S. at 80. Rather, the law prohibits only harassment that is so "severe or pervasive" that it changes the employee's "conditions" of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor*, 477 U.S. at 67). The parties debate whether a reasonable jury could find that the offensive language directed at Hamm from November 2020 to April 2021 rose to this level. But we opt not to decide this appeal based on this element either.

We instead can resolve Hamm's claim based solely on Pullman's alternative argument: that Hamm failed to offer a ground for holding the company "liable" for the abuse—even if it rose to the required level. *Doe*, 3 F.4th at 300 (citation omitted). The facts necessary to hold an employer liable for harassment depend on the status of the harasser. *See Vance*, 570 U.S. at

427–28. If the harasser is a "supervisor," the employer is automatically liable unless it can prove an "affirmative defense": that it "exercised reasonable care" to deter the abuse and that the employee did not "take advantage of" the "corrective opportunities" provided. *Id.* at 428–30 (discussing *Faragher v. Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). If, instead, the harasser is a "co-worker," the employee must establish that the employer acted negligently in failing to prevent the abuse. *See id.* at 427. And for these purposes, the Court has defined the word "supervisor" narrowly to include only those who can "take tangible employment actions" (such as a termination or transfer) against the employee. *Id.* at 431.

How does this framework apply here? Hamm alleges that mostly coworkers insulted him with homophobic slurs and abusive statements. That said, he also identifies Martinus, the superintendent at Michigan Central Station, as one of the harassers. But Hamm does not even argue—let alone offer evidence—that Martinus could take tangible employment actions against him. As a result, Hamm has failed to show that Martinus should qualify as a "supervisor" whose harassment automatically binds Pullman. *See id.* at 428–30. He thus must show that Pullman acted in a "negligent" way by permitting this abuse. *Id.* at 427.

To prove this type of negligence, employees must establish that the employer "knew or should have known" of the sexual harassment but unreasonably "failed to stop it." *Ellerth*, 524 U.S. at 759. Or, as our own caselaw puts it, the employer's response must "manifest[] indifference or unreasonableness in light of the facts the employer knew or should have known." *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 748 (6th Cir. 2008) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 339 (6th Cir. 2008)). If, then, an employer takes "prompt and appropriate corrective action" after learning of the harassment, employees cannot tie the harassment to the employer. *Doe*, 3 F.4th at 301 (citation omitted).

To decide on the propriety of an employer's response, we ask whether it was "reasonably calculated to end the harassment." *Id.* (quoting *Hawkins*, 517 F.3d at 340). The type of response thus can "vary" depending on the type of harassment. *Id.* (citation omitted). If, for example, a plaintiff complains that a coworker with an unblemished record has engaged in name calling, the employer might respond reasonably just by "instructing" the coworker to stop. *Mullins*, 291

F. App'x at 749.  If, by contrast, the plaintiff alleges more serious wrongdoing by "a known serial harasser," the employer might have to undertake other measures "to prevent future harassment" of the victim.  *Hawkins*, 517 F.3d at 341.  Our "'good faith' standard" thus gives employees flexibility over the proper way to handle employee complaints.  *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 874 (6th Cir. 1997).

Pullman satisfied this standard because it took "prompt and appropriate" action to remedy the harassment that Hamm alleged.  *Doe*, 3 F.4th at 301 (citation omitted).  As a general matter, Pullman had adopted an antidiscrimination policy that both barred all employees from engaging in "sexual harassment" of coworkers and told employees how to report harassment.  Policy, R.22-6, PageID 398; *cf. Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 684–85 (6th Cir. 2005); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997).

As a specific matter, Jacob "launch[ed]" an immediate "investigation" once Hamm filed an HR complaint on April 29, 2021—something that we have described as the "most significant" action an employer can take.  *Collette*, 126 F. App'x at 686 (citation omitted).  She interviewed Hamm the next morning.  She then interviewed nine other "[w]itnesses" (including the alleged culprits and neutral parties).  Report, R.22-11, PageID 429.  Jacob's interviews uncovered no evidence "corroborating" Hamm's allegations.  *Fox v. Yates Servs., LLC*, 2017 WL 5466657, at *3 (6th Cir. Oct. 31, 2017).  Still, she took preventative measures to deter future harassment.  Among other things, she recommended that Martinus receive a warning for using inappropriate language, that all Detroit field supervisors receive additional in-person antiharassment training, and that all employees review and re-sign the antidiscrimination policy.  *See Doe*, 3 F.4th at 302; *Nievaard v. City of Ann Arbor*, 124 F. App'x 948, 955 (6th Cir. 2005); *Courtney v. Landair Transp., Inc.*, 227 F.3d 559, 565 (6th Cir. 2000).  Lastly, Jacob "follow[ed] up with" Hamm about her findings and told him that Martinus should not have used inappropriate language when interacting with him.  *Doe*, 3 F.4th at 301 (citation omitted).  Jacob also agreed to Hamm's request for a transfer to another worksite.

Despite Jacob's substantial effort, Hamm criticizes her investigation because she found his claims "unsubstantiated" and because she did not offer him "reassurances" that the harassment would stop.  Appellant's Br. 41.  But employers who conduct good-faith

investigations need not *believe* an employee's uncorroborated allegations. *See Fox*, 2017 WL 5466657, at \*3; *Lovelace v. BP Prods. N. Am., Inc.*, 252 F. App'x 33, 42 (6th Cir. 2007); *see also Caruso v. Delta Air Lines, Inc.*, 113 F.4th 56, 73–74 (1st Cir. 2024). And given that even Hamm's own identified neutral witnesses did not support his claims, Pullman likely had no duty to undertake any remedial measures apart from conducting the investigation itself. *See Harris v. Sodders*, 2009 WL 331633, at \*2 (6th Cir. Feb. 11, 2009). So the company's notice to all employees about its commitment to a harassment-free workplace (when combined with its decision to allow Hamm to transfer) provided more than enough reassurance that future harassment would not occur. *See id.*

Hamm thus spends most of his briefing not on Jacob's investigation but on Ruff's failure to investigate *sooner* than April 29, 2021. Recall that Hamm twice informally notified Ruff over the phone about alleged harassment—once on February 12 and then again in mid-March. Yet Ruff's actions were "appropriate" given the little information that Hamm conveyed on these calls. *Doe*, 3 F.4th at 301 (citation omitted).

Start with Hamm's first call to Ruff on February 12. At that time, Hamm allegedly told Ruff that "[a] few of the guys" had called him a "faggot" and that someone had said he looked like "Kevin Bacon, 'the gay faggot that got chopped up.'" Hamm Dep., R.22-5, PageID 368. Ruff decided that he would "have a talk with all the guys" to stop the abuse. *Id.*, PageID 347. When Ruff asked Martinus about it, Martinus responded that nobody "had compared Hamm to Kevin Bacon." Ruff Aff., R.22-3, PageID 320. In these circumstances, Ruff's decision to informally speak with the crew was a reasonable response to Hamm's vague and informal concerns. *Mullins*, 291 F. App'x at 749. Among other reasons, Hamm did not report *any* other incidents at this time. Hamm Dep., R.22-5, PageID 368. And he refused to identify the culprits because he did not want to "get anybody in trouble." *Id.*, PageID 347, 368. Ruff also "follow[ed] up with" Hamm a week later. *Doe*, 3 F.4th at 301 (citation omitted). Hamm disclosed that he thought the informal talk with the crew had worked to stop the abuse. Hamm Dep., R.22-5, PageID 368.

Turn to the second alleged call to Ruff in mid-March.  At this time, Hamm allegedly told Ruff in a phone call that the crew started "calling [him] a fucking faggot" again.  *Id.*, PageID 359.  For the first time, Hamm says he also identified Martinus, Perez, and another coworker. *Id.*, PageID 369.  Ruff disputes the claim that Hamm ever told him that he had been called a "homophobic slur," and Ruff instead asserts that Hamm said only that he "did not get along with his crew" at Michigan Central Station.  Ruff Aff., R.22-3, PageID 320.  But we must take the facts in the light most favorable to Hamm.  *See Howell*, 148 F.4th at 843.  And according to Hamm, Ruff responded only that he would "take care of it."  Hamm Dep., R.22-5, PageID 359. The adequacy of this second response presents a closer call under Hamm's version of events.

Still, a reasonable jury could not find Ruff's decision to talk with the crew so inadequate as to "manifest[] indifference or unreasonableness" to Hamm's concerns.  *Blankenship*, 123 F.3d at 873.  As we have said, the appropriate response can "vary" with the circumstances.  *Doe*, 3 F.4th at 301 (citation omitted).  Given Ruff's knowledge at the time, his responses show a "good-faith" effort to address what looked more like an on-the-job personality conflict than sexual harassment.  *Blankenship*, 123 F.3d at 873.  Among other reasons, Ruff had no idea that Hamm was bisexual because nobody had disclosed that fact to Ruff.  Ruff Dep., R.22-8, PageID 408.  Even during the March call, Hamm did nothing to "specif[y]" that Martinus, Perez, and the other coworker were *sexually* harassing him.  *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 957 (7th Cir. 2024).  Rather, Ruff seemingly took Hamm's complaints about the name calling as evidence of "general[]" "friction" on the worksite.  *Id.*  And Ruff reasonably responded "according to" that perceived severity.  *Doe*, 3 F.4th at 301 (citation omitted).

Hamm's concerns also remained conclusory and informal.  In this March conversation, he referred to "[b]eing called a faggot" but did not disclose the details that he testified about in his deposition.  Hamm Dep., R.22-5, PageID 363.  And when Ruff learned of some of those details during Jacob's investigation, he readily agreed to Hamm's request to transfer.  That response perhaps explains why Hamm answered "Yes" when asked generally if Ruff had "treated [him] fairly[.]"  *Id.*, PageID 352.  All told, this case resembles those in which we have ruled for an employer that initiated a thorough investigation after an employee formally complained—even if it undertook less of an investigation after the employee raised a passing

concern.  *See Zeller v. Canadian Nat'l Ry. Co.*, 666 F. App'x 517, 526–27 (6th Cir. 2016); *Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 372 (6th Cir. 2014); *Nievaard*, 124 F. App'x at 955; *Courtney*, 227 F.3d at 565.

One last note.  Hamm also sued under Michigan's Elliott-Larsen Civil Rights Act. Unlike Title VII, this law expressly bars employers from discriminating against employees based on their "sexual orientation" (in addition to their "sex").  Mich. Comp. Laws § 37.2202(1)(a). But Hamm does not argue that we should analyze his state claims under standards different from his Title VII claims.  He has thus forfeited any argument that the Elliott-Larsen Civil Rights Act provides greater protection to employees than Title VII, and we may assume that the two laws follow an identical framework.  *See Howard v. Cherokee Health Sys.*, 2025 WL 2506651, at *3 (6th Cir. Sept. 2, 2025); *cf. Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07, 614 (6th Cir. 2019).  Hamm's hostile-work-environment claim under this law thus fails for the same reasons.

## B. Retaliation

Title VII separately makes it illegal for an employer "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [the law], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [it]."  42 U.S.C. § 2000e-3(a).  The Elliott-Larsen Civil Rights Act contains similar protections against retaliation.  *See* Mich. Comp. Laws § 37.2701(a).  Here too, though, Hamm does not argue that the two laws have different frameworks.  This forfeiture again allows us to assume that they follow the same approach.  *Cf. Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343–44 & n.1 (6th Cir. 2021).

When an employee lacks direct evidence, we follow the same burden-shifting approach in this retaliation context that we follow in the discrimination context.  *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).  Hamm must establish a prima facie case of retaliation.  *See id.*  The burden then shifts to Pullman to identify a "legitimate, nondiscriminatory reason" for firing him. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).  If it does, the burden returns to Hamm.

*See id.* He must introduce evidence that would allow a reasonable jury to find that Pullman's identified reason for his termination was "a mere pretext" for its real reason: his sexual-harassment complaint. *Id.*

Applying this framework here, we will jump immediately to the third step because Pullman has identified a neutral reason for terminating Hamm. It let him go because of his refusal to accept any job that Ruff proposed in May 2021. Hamm first hesitated over a job in "Toledo or Cincinnati" because of the "hike" to get to worksites at those locations. Hamm Dep., R.22-5, PageID 378. He then hesitated to take a local job with a quick start date because he decided to extend his medical leave "for another week" when Ruff offered it. *Id.*, PageID 379. He later expressed concern over a third and fourth job because of his fear of "heights" and "shoulder" pain. *Id.*, PageID 380–81. He lastly refrained from accepting a fifth job because it required second-shift hours that conflicted with afternoon doctor's appointments. *Id.*, PageID 381. All told, Hamm "rejected" "every available job opportunity in the area that accommodated his various restrictions," so Pullman had no work to give him. Ruff Aff., R.22-3, PageID 323.

The burden thus switches to Hamm to show that Ruff and Jacob manufactured this reason to hide their retaliatory motive. *See Kenney*, 965 F.3d at 448. He relies on a common method for proving pretext, arguing that their identified reason had "no basis in fact" because he did not decline the jobs that Ruff offered. *Id.* at 451 (citation omitted). Why? He identifies two general theories. *First*, Hamm argues that he "was still on medical leave" during his conversations with Ruff and thus that Ruff could not have made formal "job offers" for Hamm to start while on leave. Appellant's Br. 42. We see two problems with this claim. For one thing, Hamm did not mention his medical leave as the basis for declining four of the five opportunities. He instead raised concerns that the worksite was too far away, or too high in the air, or too demanding on his shoulders, or too late in the day given other appointments. For another thing, Hamm repeatedly extended his leave. His first doctor's note said that he would be ready to return on May 10. Close to that date, he then obtained a second note that said he would be ready on May 17. And around that time, he obtained a third note that said he would be ready on May 24. Ruff offered him these job assignments *before* learning that Hamm had obtained the extensions. This fact undercuts Hamm's claim that he and Ruff were engaged in mere "discussions" and that Ruff

could not have believed that he was offering these assignments to Hamm (or that Hamm was declining them). *Id.*

*Second*, Hamm argues that he did not engage in a "serial refusal of work assignments" because he never denied any of Ruff's proposals. *Id.* at 42–44. Yet he misrepresents the record in part to make this claim. Quoting the district court's opinion, Hamm suggests that he did not deny the caulking job that required him to work high in the air and instead told Ruff that he "would give it a shot." *Id.* at 43 (quoting *Hamm*, 2025 WL 792869, at *3). As Hamm should know, his own deposition flatly contradicts this claim. Pullman's counsel asked him: "But you didn't say 'I'd be willing to give it a shot,' did you?" Hamm Dep., R.22-5, PageID 381. Hamm answered: "No." *Id.* And during the call with Ruff (that Hamm secretly recorded), Hamm said he was "not at all" good at this type of work. *Id.*, PageID 380. Hamm's response to this offer came as close to an express denial as it could. All this said, we agree that Hamm did not *expressly* deny most of the jobs. For example, he did not say "No" to driving to Toledo or Cincinnati. Rather, he asked a question: "Isn't that a hike?" *Id.*, PageID 378. And he did not say "No" to the overhead demolition work; he simply said that this work "hurts [his] shoulder." *Id.*, PageID 380. Given his clear reluctance to take these jobs, we doubt that any reasonable jury could rely on this lawyerly argument to prove Ruff's and Jacob's pretext.

At day's end, though, we need not resolve this debate over whether Ruff made formal offers or whether Hamm gave formal denials. When an employee claims that an employer's reason for an adverse action had no basis in fact, the employer does not need to *prove* that reason in court. *See Morgan v. Interstate Res., Inc.*, 2024 WL 3221394, at *4 (6th Cir. June 28, 2024). It just needs to prove that it held an "honest belief" that the reason was true. *Id.* (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). So, for example, an employer who fires an employee for fraud does not need to establish that the employee committed the fraud—just that it honestly believed the employee did so. *See Seeger*, 681 F.3d at 285–87. And the employee cannot show pretext merely by showing that the reason was false. *See id.* at 285. This rule applies here. Whether or not Hamm actually declined these many offers, Ruff and Jacob at least held an "honest belief" that he did. *Id.* And Hamm's "own assertions" that he

never denied any assignment do not suffice to overcome this honest-belief rule. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012).

We affirm.